## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. __

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

        *Plaintiffs,*

v.

Matthew Barkley, Marshall Faulk, Tracy McGrady,
Scott Melker, and Stephen Piscotty,

        *Defendants.*

_____/

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

JURISDICTION AND VENUE .............................................................................................5

PARTIES .................................................................................................................................6

    I.   PLAINTIFFS ..................................................................................................................6

    II.  DEFENDANTS ............................................................................................................10

FACTUAL ALLEGATIONS .................................................................................................12

    A.   The Voyager Scheme. ...............................................................................................12

    B.   Voyager Misrepresented Its Products and Deceived the Public.................................14

    C.   Voyager's Products Are Unregistered Securities.......................................................17

    D.   Regulatory Enforcement Actions Confirm that Defendants Were Promoting Unregistered
         Securities. ..................................................................................................................25

    E.   Recent Enforcement Actions Against Crypto Influencers Confirm that Defendants Were
         Required to Disclose Their Payments from Voyager..................................................30

    F.   Voyager's Bankruptcy and Related Litigation. ........................................................32

    G.   Defendants' Deceptive and Unlawful Promotions......................................................33

        1.   Matt Barkley.....................................................................................................37
        2.   Marshall Faulk..................................................................................................49
        3.   Tracy McGrady.................................................................................................54
        4.   Scott Melker ......................................................................................................60
        5.   Stephen Piscotty ...............................................................................................65

CLASS ACTION ALLEGATIONS ......................................................................................68

    I.   CLASS DEFINITIONS................................................................................................68

    II.  RULE 23 ALLEGATIONS ..........................................................................................70

        A.   Requirements Of Rule 23(A).....................................................................................70
        B.   Requirements of Rule 23(b)(3)...................................................................................72
        C.   Requirements of Rule 23(b)(2)...................................................................................73
        D.   Requirements of Rule 23(c)(4)...................................................................................74

DEMAND FOR JURY TRIAL ..............................................................................................87

## INTRODUCTION

## FACTUAL BACKGROUND

1.      It is now clear beyond reasonable dispute from public reporting and discovery in *Karnas v. Cuban*, Case No. 22-CV-22538-ALTMAN/Reid (S.D. Fla.) (hereafter *"Cuban"*) that Voyager—the cryptocurrency exchange that declared bankruptcy and ceased operations in July 2022—was a massive fraud inflicted on more than a million victims, costing innocent investors billions of dollars. FTX was the first potential buyer/savior for Voyager in 2022. When its bid failed in November of that year, Binance followed with its own bid. But Binance balked in April 2023, and Binance is also now being sued by federal regulators and Undersigned Counsel before this Court (along with the Binance Brand Ambassadors and Social Media Influencers). The reason for these companies' failure to salvage their dying industry is now clear:  all of these platforms (Voyager, FTX and Binance) involve the sale of billions of dollars of the same unregistered securities, all in the form of native tokens and interest accounts. The SEC has made it clear that they will not allow these illegal practices to continue, having now filed many additional securities enforcement actions, all uniformly finding that trading of Crypto Tokens and creation of Crypto Interest Accounts on these platforms universally constituted the sale of unregistered securities.

2.      To make the Voyager scheme work, Voyager's founder and CEO, Stephen Ehrlich, contracted with world-famous celebrities and athletes to enlist them as Voyager's agents to solicit and promote Voyager's unregistered securities, in order to successfully raise billions of dollars and reach as many as 300 million investors across the country. Significant discovery in *Cuban* has confirmed that Voyager could not have succeeded without the support and credibility these promoters provided. *Cuban* and *Karnas v. McCarter & English*, Case No. 24-cv-20480, filed on February 6, 2024 (hereafter *"McCarter"*) are referred to herein as the "Related Cases."

1

3.      These promoters, which Voyager frequently referred to as "advisors," partnered with Voyager and acted as its agents to publicly promote the platform and solicit new customers, particularly through social media.  These partnerships put promoters in the position of receiving kickbacks and commissions based on their promotion and sale of unregistered securities to investors. The promoters who are defendants in this action are referred to herein as "Defendants."  Non-party promoters, including the Dallas Mavericks and Mark Cuban, are referred to herein as the "Other Promoters."

4.      Thus, Defendants and Other Promoters engaged in the mass solicitation of investments in unregistered securities on behalf of Voyager.

5.      None of Defendants or the Other Promoters had a reasonable basis for what they said to promote Voyager and its unregistered securities; none revealed the nature and extent of the compensation they were receiving.

## BACKGROUND OF THE VOYAGER TOKENS AND INTEREST ACCOUNTS

6.      On October 23, 2019, Voyager began offering through its mobile phone cryptocurrency trading application interest-bearing cryptocurrency accounts to public investors, offering high rates of return, represented as low-risk, in an otherwise near zero-interest rate environment. Voyager has referred to these accounts by various names over time, including the "Voyager Interest Program" or the "Voyager Earn Program Accounts" (hereafter referred to as "Earned Programs Accounts" or "EPAs"). But regardless of the name, every account Voyager sold during the class period was necessarily an EPA. Plaintiffs and other similarly situated individuals all

invested in Voyager's EPAs. These EPAs are clearly securities under applicable law.3F[1] There is no dispute that Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators.

7.      Voyager spent tens of millions of dollars to market these EPAs to every consumer in the country, without following any of the regulatory requirements required of issuers offering and selling securities designed to protect investors.

8.      Instead, with the help of Defendants and the Other Promoters to operate the marketing end of their scheme, they targeted retail investors in Florida and across the country, many with admittedly very limited experience with cryptocurrency.

9.      As far back as 2017, the SEC began issuing opinions regarding the promotion of similar unregistered offerings for many of the largest crypto platforms, including Coinbase, FTX, Voyager, and BlockFi. After enforcement proceedings were brought by the SEC and state regulators in mid-2021, BlockFi — represented by the law firm Sullivan & Cromwell (who also represented FTX) — agreed to settle similar "unregistered securities" charges with the SEC and numerous state attorneys general, paying an over $100-million-dollar fine and agreeing to injunctive changes regarding their practices surrounding the offer and sale of interest-bearing cryptocurrency accounts. Also in mid-2021, Coinbase was in confidential discussions with the SEC about their similar interest-bearing cryptocurrency accounts.

10.     Ehrlich placed a high value on supporting the public image of Voyager through celebrity promoters.  Ehrlich recruited Voyager's celebrity promoters to help Voyager achieve its sole

---

[1] The question of whether Voyager's offering and selling the EPAs violates applicable securities laws is a common and predominant issue that is capable of swift resolution by this Court on a class-wide basis, which determination would materially advance this litigation for Plaintiffs and the potentially millions of affected consumers around the nation.

goal of driving all U.S. investors to purchase EPAs. Unfortunately for Plaintiffs and the Class, those celebrity promoters' personal efforts were wildly successful.

11.     It is important to note that many crypto exchanges for the past few years have sought to obtain their own confidential legal opinions to share with investors to convince them that their interest-bearing accounts, native cryptocurrency tokens, and other offerings were not securities required to be registered with any securities regulators. This became more difficult, however, as the SEC brought dozens of enforcement actions and made public their findings that the majority of these offerings are, in fact, securities, dealing a significant blow to any "fair notice" defenses or ability for law firms to plausibly state in good faith that these offerings were not securities.

12.     Each of the Plaintiffs and the proposed Class Members, purchased, repurchased, invested, reinvested, deposited, and/or transferred additional crypto into an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in the complaint, and they each sustained damages as a result. As discussed below, New Jersey specifically intended its own state securities laws to apply extraterritorially for the benefit of every purchaser nationwide because the actions of Voyager took place from its principal place of business in New Jersey. The EPAs that Voyager sold to Plaintiffs were no different (in any manner) than any of the other EPAs that Voyager offered and sold to all investors throughout the nation during the class period, all of which are currently subject to investigation by federal and state regulatory authorities as being unregistered securities, and which number in "at least tens of thousands" in the state of Florida alone.[2]

---

[2] *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative in *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), at

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d), because this is a class action for a sum exceeding $5,000,000.00,

exclusive of interest and costs, in which at least one class member is a citizen of a state different than

Defendants.

14.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the

Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes

§ 48.193(1)(a)(1), (2), and (6), because some of the actions giving rise to the Complaint took place in

this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging

in, or carrying on a business venture in this state, committing a tortious act in this state, engaging in a

civil conspiracy with residents of the state, and causing injury to property in this state arising out of

Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants

were engaged in solicitation or service activities within this state, or products that Defendants

promoted, sold, and offered for sale in this state were used or consumed within this state in the

ordinary course of commerce, trade, or use.

---

ECF No. 34-1, at 89 (41:20–42:15) ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: No. His earn would be the same, as far as I know, in those state -- in those states. Q. So there's no distinction for the Voyager Earn Program by state. . . . THE WITNESS: Yes, as far as I'm aware."); *see also id.* (107:10–13) ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); *id.* (133:2–134:13) ("Q. Okay. So . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy's account? . . . THE WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that his account is the same account that these attorney generals and the SEC are saying possibly should be registered securities? . . . THE WITNESS: To the extent I know, they – they would not be different from any of the other accounts.").

15.     Additionally, Defendants have intentionally availed themselves of the Florida consumer market through the targeted promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed, participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida, in violation of section 517.07 *et seq.* Defendants have also violated Florida's consumer protection statute, section 501.201 *et seq.* Personal jurisdiction over Defendants is established under Rule 4(k)(1) of the Federal Rules of Civil Procedure based on service of summons upon or waiver of service by Defendants, each of which is subject to the jurisdiction of courts of general jurisdiction in Florida. This Court's exercise of jurisdiction over Defendants for the claims asserted in this action comports with traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court under 28 U.S.C. § 1391 because thousands of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; Defendants have caused harm to Class members residing in this District; Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District; and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

17.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## PARTIES

### I.     PLAINTIFFS

### Edwin Garrison

18.     Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Garrison purchased, repurchased, invested,

reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

19.    On October 29, 2021, Mr. Garrison originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. He further repurchased, reinvested, deposited, and/or transferred additional funds into his throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

20.    Mr. Garrison was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Dominik Karnas**

21.    Dominik Karnas is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Karnas purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

22.    While in Florida, on or about November 14, 2021, Mr. Karnas purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Karnas further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

23.     Mr. Karnas was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Rahil Sayed**

24.     Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Sayed purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

25.     On February 3, 2021, Mr. Sayed originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Sayed further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed. Mr. Sayed was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**William Ayer**

26.     Plaintiff William Ayer is a citizen and resident of the Commonwealth of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Ayer purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

27.     On February 1, 2021, Mr. Ayer originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Ayer further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

28.     Mr. Ayer was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Anthony Dorn**

29.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Dorn purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

30.     On February 12, 2021, Mr. Dorn originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Dorn further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

31.     Mr. Dorn was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform.

**Todd Webb**

32.     Plaintiff Todd Webb is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Webb purchased, repurchased, invested,

reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

33.    On October 30, 2021, Mr. Webb originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Webb further repurchased, reinvested, deposited, and/or transferred additional crypto into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

34.    Mr. Webb was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, while in Florida, Mr. Webb conducted research on cryptocurrency.

## II.    **DEFENDANTS**

35.    Defendant Matthew Barkley is a professional football player who is a quarterback in the National Football League ("NFL") for the Jacksonville Jaguars. Defendant Barkley s a resident of the state of California.  He has substantial ties to Florida, including being a player with the Jacksonville Jaguars professional football team. Barkley has intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Barkley permissible under traditional notions of fair play and substantial justice.

36.    Defendant Marshall Faulk is a former professional football player who played in the NFL for the Indianapolis Colts and St. Louis Rams.  Defendant Faulk is widely regarded as one of the greatest running backs of all time. Defendant Faulk is a resident of the state of California. Faulk has

intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Faulk permissible under traditional notions of fair play and substantial justice.

37.     Defendant Scott Melker is a crypto trader, investor, and self-proclaimed "cryptocurrency advocate."  Defendant Melker is a resident of the state of Florida.  Melker is the host of the popular "Wolf of All Streets" podcast, the author of "The Wolf Den" newsletter, and a writer and thought leader in the crypto industry. Melker is "an adviser to a number of blockchain-based projects and has been a frequent contributor and commentator for Cointelegraph Markets."[3] Melker was named "Influencer Of The Year" by Binance in 2020, and has been recognized as a leading voice in cryptocurrency.[4] Melker has been featured in Fox Business, the New York Times, Business Insider, The Wall Street Journal, and other publications.  Melker has also intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. Melker's residency in Florida and his purposeful availment render the exercise of jurisdiction by this Court over Melker permissible under traditional notions of fair play and substantial justice.

38.     Defendant Tracy McGrady is a former professional basketball player who was born in Bartow, Florida. McGrady is a seven-time National Basketball Association ("NBA") All-Star and two-time NBA scoring champion, and is regarded as one of the greatest scorers and shooting guards in

---

[3] https://cointelegraph.com/top-people-in-crypto-and-blockchain-2021/scott-melker (accessed January 15, 2024).
[4] *Id.*

NBA history. McGrady is a resident of the state of Texas. McGrady has substantial ties to Florida, including significant and substantial business activities in Florida. McGrady has intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over McGrady permissible under traditional notions of fair play and substantial justice.

39.     Defendant Stephen Piscotty is a professional baseball outfielder who has played professionally in Major League Baseball ("MLB") for the St. Louis Cardinals and Oakland Athletics. Piscotty is a resident of the state of California.   Piscotty has intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Piscotty permissible under traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### A.  The Voyager Scheme.

40.     Voyager operated a cryptocurrency investing application for iOS and Android mobile devices (hereinafter, the "Voyager Platform") that allowed users to purchase and trade cryptocurrency and invest money in interest bearing accounts. Until Voyager's recent bankruptcy, it claimed to have more than $5 billion in assets under management and over 3.5 million investors.

41.     At all times relevant to this lawsuit, Voyager's stock was listed and publicly traded on Canadian stock exchanges and sold throughout the United States, including in Florida, through many US brokerages in "over-the-counter" trading.

42.     Voyager quickly became one of the most utilized avenues for investors to purchase and invest in cryptocurrency and related crypto securities. It engaged in an extremely aggressive promotional and solicitation campaign via influencers and celebrities who received financial incentives, that targeted primarily new or less knowledgeable cryptocurrency users. Users could download the application, create an account, fund it (by transferring US dollars ("USD") from a bank or cryptocurrency from a "wallet"[5]), and begin trading immediately. Voyager claimed that users could open an account and begin trading in three minutes or less.

43.     Voyager positioned itself to connect users with more than a dozen different cryptocurrency exchanges and to trade more than 50 cryptocurrencies. Voyager did that so its users could build a portfolio of crypto assets without having to sign up for multiple exchanges and manage multiple accounts.

44.     To execute transactions and obtain for its users the best execution prices for crypto trades, Voyager claimed to employ various proprietary technologies including the so-called "Voyager Smart Order Router." According to Voyager, when users made a purchase or a trade, they could select the currencies they intended to buy or sell (and the amount), but users would not choose which exchange they currency came from. Rather, Voyager represented to users that it would execute the transaction at the best price available across multiple exchanges.

45.     The Voyager Platform was based upon false representations and other deceptive conduct. Voyager's scheme was specifically designed to take advantage of unsophisticated investors who utilize mobile apps to make their investments.

---

[5] Cryptocurrency is sent and received from or to so-called "wallets," which are locations identified by a combination of letters and numbers called a "hash" that is unique to the holder of the "key" for that wallet address. Wallets are roughly analogous to an email address or bank account number that allows for the transmission of cryptocurrency from one user to another.

**B. Voyager Misrepresented Its Products and Deceived the Public.**

46.     According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."17F[6] Voyager represented prominently and consistently to the investing public that the Voyager Platform offered trades that were "100% Commission-Free."

47.     Voyager also claimed to provide users that bought and sold cryptocurrencies the ability to execute trades across a spectrum of exchanges in order to give Voyager "deep pools of liquidity."[7] It also offered a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[8] Some of the additional features that Voyager offered were: (a) users could trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies; (b) Voyager allegedly minimized transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing the "Smart Router" technology; and (c) Voyager claimed to store crypto assets in a secure wallet and in a "cold" facility, with 24/7 security.[9]

48.     These representations enabled Voyager to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

---

[6] The operative complaint in *Cassidy*, found at ECF No. 46, is attached hereto as Plaintiffs' Exhibit 284 ("*Cassidy* Complaint"). *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021 (attached to the *Cassidy* Complaint as Exhibit J).

[7] *See Cassidy* Complaint, Ex. H.

[8] *Id.*

[9] *Id.*

49.     Voyager's representation that trades on the Voyager Platform were "100% Commission-Free," however, were false and intended to mislead reasonable consumers. In fact, Voyager secretly charged exorbitant commissions on each trade.

50.     Voyager perpetrated the scheme by, among other means, maintaining the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explained in its most recent Management's Discussion and Analysis that the spread was a main source of revenue:[10]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

51.     Although the Voyager Platform displayed a "Fair Market Price" for each cryptocurrency, which fell somewhere in the middle of the spread, Voyager automatically executed market orders at the highest end of the spread, from which they pocketed secret commissions.

52.     Moreover, once a user submitted a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaulted to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order could be executed at an amount "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade automatically defaulted to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order could be executed at an amount "more" than the "Estimated Price," but still at the bottom end of the spread.

---

[10] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, (Ex. M of the *Cassidy* Complaint).

53.     To effectuate and conceal this deception, Voyager claimed to use proprietary systems, which they referred to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[11]

54.     In describing the Smart Order Router, Voyager maintained that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[12] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[13]

55.     Voyager also utilized vague and opaque representations to tout that it would only "share" in "price improvement" where it could fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the escalated estimated price that is only shown after the customer submits the market order).[14] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."26F[15]

56.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" intentionally were designed to be obscure and to

---

[11] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed May 8, 2023).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

provide Voyager with hidden commissions on every trade, that in most cases, would exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gained an edge on its competition and overcharged customers by collecting these secret commissions to the detriment of its unknowing customers.

57.    In addition, Voyager's representations about providing the best execution of trades across the marketplace and "Better Pricing on Trades" across the exchanges are demonstrably false. Numerous other exchanges provide better rates. For the vast majority of transactions that users performed on Voyager, such users could have obtained better pricing from other cryptocurrency exchanges. In fact, the rates Voyager offers would result in a plainly worse deal to users, often to the tune of nearly or more than 1% higher than 2competitors, even on highly liquid products.

58.    Voyager also represents to the public on its website that it is "publicly traded, licensed, and regulated." What Voyager fails to disclose in proximity to its advertising claim that it is "publicly traded," however, is that Voyager Digital, LLC's parent company, Voyager Digital Ltd., is publicly traded *in Canada,* not the U.S. Thus, Voyager's advertising claim that it is "publicly traded" is inaccurate with respect to Voyager Digital, LLC, which is not a publicly traded entity, and creates a misleading impression with respect to Voyager Digital, LLC's regulatory status, particularly because Voyager's website notes that "[a]ll services [are] provided by Voyager Digital, LLC." Voyager's claim to be "licensed" stems from state licensing in far fewer than all U.S. states as a money transmitter, or money services business, which is unrelated to Voyager's offering and selling of unregistered securities and conveys the impression to unsophisticated investors that Voyager is "licensed" to offer and sell such securities, when it is not.

### C. Voyager's Products Are Unregistered Securities.

59.    On October 23, 2019, Voyager began offering the EPAs to public investors.

60.     From October 23, 2019, until Voyager declared bankruptcy on July 5, 2022, every account sold to customers of Voyager was necessarily an EPA, unless the customer took affirmative steps to separately "opt out" of having an EPA. There was no separate step necessary to opt in to having an EPA, there was no separate type of Voyager account to choose from when signing up for the account immediately after downloading the app (which was only available by phone, no desktop application for computers or any other devices). Ehrlich did not know the process, nor did he know how many opted out, though he admitted Voyager had that information. Upon information and belief, the number of customers who "opted out" of having an EPA is de minimis, and it is even possible that there were no opt outs.

61.     Voyager initially launched the EPAs for customers holding Bitcoin and subsequently expanded its EPA program to provide high rates of return to users who maintained a variety of crypto assets in their Voyager accounts. Through the pervasive promotions, advertisements, and solicitations by Voyager and Defendants, the EPAs became one of the most popular crypto-related investments nationwide, particularly for novice investors.

62.     Voyager solicits retail investors to invest in the Voyager EPAs by depositing certain eligible investments into the EPA. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. In exchange for investing in EPAs, investors are promised monthly returns and interest.

63.     The vast majority of assets on the Voyager Platform consisted of EPAs. Voyager's own documents stated that its "users are automatically enrolled in the Voyager Earn Program" and would earn interest if they: "Simply maintain the required minimum monthly average balance of any of our reward-bearing digital assets to participate. Rewards are paid out on assets monthly and deposited directly into your Voyager account." Voyager Chief Executive Officer, Steve Ehrlich,

testified that he had no idea what percentage of new users opted out of the EPA program or whether it was more or less than 1%. He never cared what the number was and did not even know what the process was to opt out.

64.    Voyager also operated a "Loyalty Program." Under that program, and "depending on [users'] loyalty tier," users could double or triple the amount of their "annual rewards boost paid in" Voyager Token (VGX) for holding certain assets on the Voyager Platform. VGX in turn, was Voyager's propriety cryptocurrency token whose value (and therefore the value of the "annual rewards boost" paid to Voyager users) was substantially linked to the ability of Voyager and Defendants to successfully promote Voyager's platform and its products.

65.    To obtain the promised value of VGX rewards, Plaintiffs had to give something of value to Voyager. For example, Plaintiffs purchased VGX tokens from Voyager using traditional fiat currency or other forms of cryptocurrency.

66.    The rates of return associated with EPAs reflected Plaintiffs' participation in earnings resulting from Voyager's use of Plaintiffs' funds. Voyager explained:

> We will lend, sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of funds and cryptocurrency assets to counterparties, and we will use our commercial best efforts to prevent losses.

> In consideration for the interest earned on your account, you grant the right, subject to applicable law, without further notice to you, to hold the cryptocurrency held in your account in the firm name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

67.     The investors' success was linked to the success of Voyager, including because Plaintiffs expected to receive variable interest returns for investing in cryptocurrency on the Voyager Platform, and the returns were dependent on Voyager's use and investment of Plaintiffs' assets.

68.     On information and belief, when Plaintiffs and other investors transferred cryptocurrency tokens to Voyager, the assets were pooled together and investors shouldered the risks associated with the platform and other platforms and/or entities to which Voyager would "lend, sell, pledge, rehypothecate, assign, invest, use, commingle," etc., investors' assets while using Voyager's "best efforts" to provide financial returns.

69.     Both Voyager and Defendants, acting as agents and/or partners of Voyager, prominently touted that cryptocurrency holdings on Voyager would earn rates of return of up to 9% or more. All Plaintiffs had to do was fund the investment, which allegedly could be done in three minutes. The investors had no material involvement generating the advertised profits. These passive investment returns were a primary focus of Defendants' paid promotions and solicitations directed at Plaintiffs.

70.     The EPAs constituted "securities" as defined by state and federal securities laws. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion." To generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities.

71.     The more transactions conducted on the Voyager Platform, the more profit Voyager made by taking commissions (i.e., by manipulating the price at which the trade was executed). On information and belief, Voyager used some portion of that revenue, directly or indirectly, in combination with revenue generated from undisclosed high-risk loans or other activity to finance interest that Voyager was paying on EPAs.

72.     Notwithstanding Voyager's misleading claims to be licensed and regulated, Voyager's EPAs were neither licensed nor regulated by state or federal securities regulators, even though it is a security required to be registered.

73.     The absence of any registration statement meant that Plaintiffs and other investors lacked material information about the Voyager EPAs. The missing material information included, among other things, the business and financial condition of Voyager, the fees charged, the extent of Voyager's profits, and specific and detailed risks of the investment, including how Voyager determined to lend or stake investor tokens and the extent of liquidity reserves, or whether investor's crypto investments are put to some other use.

74.     Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*") and by the SEC, sources of authority that state courts around the country look to in construing their own analogous state securities laws, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

75.     It is important to note that many crypto exchanges for the past few years have sought to obtain their own confidential legal opinions to share with investors to convince them that their interest-bearing accounts, native cryptocurrency tokens, and other offerings were not securities required to be registered with any securities regulators. This became more difficult, however, as the SEC brought dozens of enforcement actions and made public their findings that the majority of these offerings are, in fact, securities, dealing a significant blow to any "fair notice" defenses or ability for law firms to plausibly state in good faith that these offerings were not securities.

76.     Voyager sought a legal opinion concerning whether its products constitute securities from its outside counsel, McCarter & English, LLP.[16]   The McCarter & English legal opinion, unsurprisingly, includes many spurious arguments and claims that are not based on credible authorities

---

[16] McCarter & English, LLP is a defendant in *McCarter*, filed in this district on February 6, 2024.

or evidence. The memo principally relies on the "Framework for 'Investment Contract' Analysis of Digital Assets (April 3, 2019), a speech given by then SEC director of Corporate Finance, Bill Hinman, in September 2018, and two no action letters related to "utility tokens" provided by the SEC. However, the memo was written in May 2021, at which time there was plenty of other SEC enforcement actions,[17] multiple speech,[18] Congressional testimony,10F[19] and several official SEC statements11F[20] and proclamations.12F[21] Notably, the memo ignores the 2017 Section 21(a) Report of Investigation that looked at the facts and circumstances of "The DAO," which was an infamous initial coin offering that the SEC found constituted an unregistered security. The memo also ignores the SEC's complaint against Telegram, filed on October 11, 2019, and a preliminary injunction issued in May 2020 barring the delivery of Telegram's token, Grams, and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully. Further, footnote 1 to the Hinman speech notes that "this speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff." Hinman was a one-time employee of the SEC who left the Commission in December 2020, well before this memo was written. Therefore, the speech reflects the opinion of one person who was no longer an SEC employee, it cannot, and should not, be taken as legal guidance. Finally, the opinion admits that the first two prongs of the *Howey* test are met and does not raise valid arguments to establish the remaining two are not.

---

[17]  https://www.sec.gov/spotlight/cybersecurity-enforcement-actions(Crypto Assets and Cyber Enforcement Actions) (accessed May 8, 2023).

[18]  https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 8, 2023).

[19]  https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 8, 2023).

[20]  https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 8, 2023).

[21]     https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 8, 2023).

77.     Here, contrary to the McCarter & English legal opinion, both the EPAs and Voyager's VGX tokens are clearly securities under the *Howey* test. Purchasers of EPAs and VGX expected profits. Voyager's main selling point for both EPAs and VGX is that purchasing either entitled users to earn "rewards" on the Voyager Platform. For instance, EPA purchasers could earn up to 9% interest on their deposits of USD Coin ("USDC")—the "stablecoin" cryptocurrency promoted as capable of staying steady with the value of the U.S. dollar—in their EPAs.  Similarly, VGX holders were entitled to earn 7% of VGX held in their account per year. Use of the word "rewards" is misleading—in this case it is the exact same thing as interest. Thus, the company was marketing that EPA and VGX holders could earn interest on their holdings, thus clearly communicating a profit opportunity (one they made sound risk-free). Voyager never explains where these "rewards" came from. Rather, they just claim that they are delivered from Voyager's "treasury." This representation is inherently meaningless. The only way rewards could be paid is either the company created new VGX tokens out of thin air to pay "rewards," or pooled user VGX tokens and other cryptocurrency tokens and loaned them out to other parties and paid interest, minus a spread, to EPA and VGX token holders. Either way, Voyager's efforts are critical to the success of the EPA and VGX endeavours.

78.     Voyager also made it clear that VGX tokens were tradeable on secondary exchanges, including the world's largest crypto exchange, Binance. The presence and marketing of secondary trading is another way the company led users to believe they could expect to profit off VGX. Even the "Framework for 'Investment Contract' Analysis of Digital Assets" lists the following factor as making it more likely "that there is a reasonable expectation of profit": "The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future."[22]

---

[22]   https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets   (accessed May 8, 2023).

79.     Voyager has argued that VGX tokens are akin to airline miles, but a key difference is that airlines miles are NOT tradeable on a secondary market. Note that the "Framework" acknowledges this point as well in footnote 19. Furthermore, Voyager cannot plausibly argue VGX is a utility token when anybody could have used the Voyager platform without ever having to hold VGX.

80.     Clearly, Voyager's efforts were instrumental in making its EPAs and VGX worth anything at all. This is obvious for VGX when you consider the fact that the price of VGX plummeted once Voyager filed for bankruptcy. Furthermore, Voyager played the most critical role in generating the "rewards" paid pursuant to the EPAs and in making VGX work, including:

a.   Voyager was responsible for paying "rewards."

b.   Holders of New VGX would rely on the company to be the administrator to maintain features and rewards of VGX.

c.   All VGX "rewards" are tied to use of the Voyager platform, such as 7% rewards on VGX tokens, trades executed on Voyager or using a Voyager debit card. Voyager therefore needs to be a functioning company for these "rewards" to have any value.

d.   The fact that Voyager was able to execute a "swap" of old VGX for new VGX makes clear that Voyager solely controlled the issuance and destruction of VGX tokens and could do whatever they wanted, whenever they wanted. Voyager administered the swap contract that executes the "swap" and could turn the swap on and off at a moment's notice.

81.     Similarly, under the "family resemblance" test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990) ("*Reves*"), an instrument is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance to one of the categories of instrument identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976): the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its

assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note that simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] … notes evidencing loans by commercial banks for current operations. The Supreme Court in *Reves* listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument.

82.     Voyager sold investment contracts without registering the offer or sales with state or federal regulators, including the SEC, as required by law, and no exemption from the registration requirement applied.

### D. Regulatory Enforcement Actions Confirm that Defendants Were Promoting Unregistered Securities.

83.     Voyager, Defendants and the Other Promoters knew or should have known that the objective of their partnership, and the promotional activity they undertook together, constituted promoting unregistered securities.

84.     Both before and after Defendants began soliciting investments in Voyager's digital assets, there was significant national attention to the fact that cryptocurrency investment products substantially identical to Voyager's products were investment contracts that constituted securities under both federal and state law, including New Jersey law that applies here for all class members nationwide.

### i. BlockFi Order

85.     On July 20, 2021, the New Jersey Bureau of Securities published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'BlockFi' to Stop Offering Interest-Bearing Accounts."28F[23]

86.     The Bureau stated that it was ordering the "financial services company based in Jersey City from selling unregistered securities in the form of interest-earning cryptocurrency accounts"; and that the company had been funding its "cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the Securities Law."29F[24]

87.     The Bureau announced that "Cryptocurrency investment products offered and sold on decentralized finance platforms carry significant risks, even beyond those associated with the volatility of cryptocurrency . . . Platforms like BlockFi may mirror the traditional financial structures that we know and trust, but in reality they can leave investors extremely vulnerable."

88.     Voyager's products functionally mirror what BlockFi was offering, i.e., the opportunity to invest in an "interest account by depositing certain eligible cryptocurrencies – including Bitcoin and Ethereum – into accounts at BlockFi. BlockFi then pools these cryptocurrency deposits together to fund its cryptocurrency lending operations and proprietary trading. In exchange for investing in the BlockFi Interest Accounts, investors are promised an attractive interest rate that is paid monthly in cryptocurrency."

89.     In material respects, the financial products offered by Voyager were the same as BlockFi accounts that were unregistered securities under New Jersey law.

---

[23] https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023).
[24] https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf (accessed May 8, 2023).

**ii. Celsius Order**

90.     On September 17, 2021, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Firm Celsius to Halt the Offer and Sale of Unregistered Interest-Bearing Investments."[25] The Bureau stated that the cryptocurrency platform "has been funding its cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the New Jersey Securities Law" and that "[i]f you sell securities in New Jersey, you need to comply with New Jersey's investor-protection laws."

91.     As described by the Order in New Jersey, Celsius's interest bearing program was substantially the same as Voyager's EPAs in all material respects. The Bureau pointed out that "Earn Rewards investors can earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius." Celsius offered returns that were "tiered depending upon the nature and amount of cryptocurrency invested, as explained on the Celsius Website."

92.     The Bureau's Order also emphasized that the Earn Rewards program were promoted as "long-term investments" as evidenced by the statement on Celsius's homepage: "Start earning top rates on any amount of crypto and get paid every paid every [sic] Monday to keep 'HODLing." Celsius encouraged users to hold their investments instead of selling or trading as "it would be a mistake to sell at this early stage." (As discussed below, Voyager and certain Defendants also encouraged Plaintiffs to "hold" their digital asset investments.)

---

[25]     https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-firm-celsius-to-halt-the-offer-and-sale-of-unregistered-interest-bearing-investments/ (accessed May 8, 2023).

93.     Much like Voyager, Celsius did "not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities."

94.     The Bureau concluded that the "Earn Rewards product is a security as defined in section 49:3-49(m) of the NJUSL. The Earn Rewards product was and is required to be registered with the Bureau pursuant to section 49:3-60 of the NJUSL. The Earn Rewards product has not been registered with the Bureau, is not exempt from registration, and is not federally covered. Celsius has offered and sold unregistered securities in violation of section 49:3-60 of the NJUSL and continues to do so."

### iii. Kraken Order

95.     On February 9, 2023, the SEC published a press release that received media attention titled "Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges."[26] The SEC announced that it had charged the entities known as Kraken "with failing to register the offer and sale of their crypto asset staking-as-a-service program, whereby investors transfer crypto assets to Kraken for staking in exchange for advertised annual investment returns of as much as 21 percent," and that the Kraken entities, to settle the SEC's charges, "agreed to immediately cease offering or selling securities through crypto asset staking services or staking programs and pay $30 million in disgorgement, prejudgment interest, and civil penalties."

---

[26] https://www.sec.gov/news/press-release/2023-25 (accessed May 8, 2023).

96.     The SEC detailed Kraken's "staking services," in which "Kraken pools certain crypto assets transferred by investors and stakes them on behalf of those investors. Staking is a process in which investors lock up—or 'stake'—their crypto tokens with a blockchain validator with the goal of being rewarded with new tokens when their staked crypto tokens become part of the process for validating data for the blockchain. When investors provide tokens to staking-as-a-service providers, they lose control of those tokens and take on risks associated with those platforms, with very little protection." The SEC alleged that "Kraken touts that its staking investment programs offers an easy-to-use platform and benefits that derive from Kraken's efforts on behalf of investors, including Kraken's strategies to obtain regular investment returns and payouts."

97.     The SEC's action confirms that the types of crypto products offered by Voyager were securities. The press release quotes SEC Chair Gary Gensler stating, "Whether it's through staking-as-a-service, lending, or other means, crypto intermediaries, when offering investment contracts in exchange for investors' tokens, need to provide the proper disclosures and safeguards required by our securities laws. Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection."

#### iv. Voyager Order

98.     On March 29, 2022, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'Voyager Digital' to Stop Offering and Selling Interest-Bearing Accounts."[27]

99.     The Bureau announced that it was ordering the "Jersey City-based financial services company from selling unregistered securities in the form of interest-earning cryptocurrency accounts

---

[27] https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023)

that have raised at least $5 billion nationwide," and that the company had been allegedly funding its "income generating activities—including lending operations, digital asset staking, and proprietary trading—at least in part through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts in violation of the Securities Law."

100.    The Bureau stated, "Unregistered securities offerings pose significant risk to investors because the issuers do not make the same types of disclosures, including, for example, providing detailed financial statements that typically accompany registered offerings." The Bureau detailed how "[i]nvestors in unregistered offerings like the 'Voyager Earn Program Accounts'…may not receive any information about the specific investment strategies used by the issuer to generate investment returns, may not be advised about the creditworthiness of counterparties with whom the issuer does business, and may not be apprised of the use of leverage, or other risky investment strategies employed by the issuer to generate a return."

101.    The Bureau outlined that "Voyager solicits investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager account. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, digital asset staking, proprietary trading, and investments in other cryptocurrency platforms, such as Celsius Network. In exchange for investing in the Voyager Earn Program Accounts, investors are promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested."

### E. Recent Enforcement Actions Against Crypto Influencers Confirm that Defendants Were Required to Disclose Their Payments from Voyager.

102.    Recently, the SEC reached a settlement with former professional basketball player and sports analyst Paul Pierce for touting on Twitter for a two-week period in 2021 a "crypto asset security" that was being offered and sold. Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

Pierce, at least negligently, made materially false and misleading misstatements in his Twitter posts promoting the crypto asset security, including statements regarding the amount he had earned from holding the crypto asset security, and statements indicating that he was holding—and intended to increase—his investment in the crypto asset security while contemporaneously selling the securities. Pierce's conduct violated Section 17(a)(2) of the Securities Act, which prohibits obtaining money or property by means of an untrue statement of a material fact or any omission of material facts necessary to make statements made not misleading in the offer or sale of securities.

In addition, Pierce did not disclose that he was being compensated by the entity offering and selling the security for giving the crypto asset security publicity. Pierce's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration from an issuer.[28]

103.    The Paul Pierce case was not the only time an influencer was fined for non-disclosure. On October 22, 2022, the SEC reached a settlement with Kim Kardashian for touting on Instagram a "crypto asset security" that was being offered and sold by EthereumMax without disclosing the payment she received for the promotion.

104.    Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

On June 13, 2021, Kardashian—a well-known media personality and businesswoman—touted on social media a crypto asset security that was being offered and sold. Kardashian did not disclose that she was being compensated for giving such security publicity by the entity offering and selling the security. Kardashian's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration from an issuer. Kardashian's crypto asset security promotion occurred after the Commission warned in its July 25, 2017, DAO Report of Investigation that digital tokens or coins offered and sold may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. The promotion also occurred nearly four years after the Commission's

---

[28] *In re Pierce*, SEC Admin. Proceeding File No. 3-21305 (Feb. 17, 2023) (summary of order instituting cease-and-desist proceedings at paras. 1–2).

Division of Enforcement and Office of Compliance Inspections and Examinations issued a statement reminding market participants that "[a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.[29]

### F. Voyager's Bankruptcy and Related Litigation.

105. On December 24, 2021, counsel for Plaintiffs and the class members brought the first (and only) putative Nationwide Class Action complaint against Voyager, the *Cassidy* Action (*Cassidy v. Voyager Digital Ltd.*, S.D. Fla. Case No. 21-cv-24441). In that complaint, the plaintiffs alleged that Ehrlich teamed up with Defendants Cuban and the Mavericks to promote Voyager by making false representations and employing other means of deception.

106. The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

107. After the *Cassidy* Complaint was filed, the following important actions took place: (a) the SEC began an enforcement review focused on whether Voyager's EPAs constitute unregistered

---

[29] *In re* Kardashian, SEC Admin. Proceeding File No. 3-21197(Oct. 3, 2022) (summary of order instituting cease-and-desist proceedings at para. 1).

securities; (b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) found that Voyager was violating their state laws, including finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based) and that the EPAs are an unregistered security; and (c) on March 29, 2022, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day.[30]

108.    On July 5, 2022, Voyager and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York.

109.    On September 28, 2022, Voyager filed a motion in the Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager would sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, was estimated to be $1.311 billion, plus (b) additional consideration which was estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

### G.  Defendants' Deceptive and Unlawful Promotions.

110.    Voyager's rapid growth in 2021 and 2022 was made possible due to the sustained and aggressive promotion and advertising campaign by Defendants and the Other Promoters.

---

[30]        https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed May 8, 2023); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed May 8, 2023).

111.     Defendants and the Other Promoters collectively were paid millions of dollars in cash and VGX cryptocurrency (among other cryptocurrencies) to broadly solicit potential investors with promotional statements, contests, coupon codes, offers of free cryptocurrency, sign-up incentives, and other strategies to entice people to purchase cryptocurrency on Voyager, including express or implied solicitations for their fan bases to purchase EPAs, which were unregistered securities.

112.     These Voyager celebrity agents included Mark Cuban and the Dallas Mavericks.  Some Plaintiffs to this action have sued Cuban and the Mavericks in this district in _Cuban._  Voyager, Cuban, the other defendants in the Related Cases, and Defendants in this action, were engaged in a common civil conspiracy against Plaintiffs and the Class Members to profit from Voyager's fraud and other wrongdoing.

113.     There is no question that Defendants were touting EPAs, regardless of whether their advertisements expressly referenced EPAs. Defendants McGrady, Faulk, Barkley, and Melker all touted the interest rates between 7% and 12% Voyager offered on crypto assets. These interest rates were available only to EPA account holders. Additionally, as described above, all users were automatically signed up for an EPA unless they expressly opted out (and discovery to the date of filing this Complaint has not revealed evidence of a single opt out). For example, Cuban specifically touted the EPAs during the October 27, 2021 press conference, explaining

> You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

114.     Cuban made a multitude of other statements touting the relative safety and quality of investing in an EPAs with Voyager.

115.     Additionally, Defendant Melker posted that investors could get a "free house" by taking on "cheap debt" and investing the cash in Voyager, based on the "10% a month in usdc" that Voyager offered:



116.     Similarly, Defendant McGrady was quoted in one promotional post stating: "I'm earning 8.5% interest APR on USDC with Voyager. It's easy and beats any bank."[32]

117.     Defendant Barkley reposted Voyager's social media posts regarding the earn program in an effort to convince more investors to invest in Voyager's earned program account:

---

[31] https://twitter.com/GhostofWhitman/status/1722481618722374082
[32] https://www.instagram.com/p/CG0gCWOA8Dv/



118.    The Defendants knew that their endorsements of Voyager would influence people because of their substantial professional accomplishments and celebrity status. They all have thousands or even hundreds of thousands followers across social media. They all understood the effect their promotional activity for Voyager was causing—including because social media sites like Twitter (now X), Instagram, and YouTube allowed them to see the number of impressions, "likes," views, comments, re-Tweets, etc., that the promotions were generating. On information and belief, Defendants also knew their promotional activity had a significant impact on investor behavior based on feedback and information they received from Voyager. Indeed, though reliance is not an element of these claims, many—if not all—Plaintiffs and Class Members specifically relied on Defendants' statements concerning Voyager.[34]

---

[33] https://twitter.com/investvoyager/status/1521559775242248192

[34] *See, e.g., Calabro v. Pares*, 2020 WL 7481301, at *2 (S.D. Fla. May 27, 2020), *report and recommendation*

119.     Public-facing announcements and press releases concerning Defendants' relationships with Voyager described them as "partners," "friends," "key advisors," and/or "advisors" of Voyager.

120.     Defendants' success in touting Voyager depended on concealing their true motives. Many of the public promotions intentionally had a quality of being spontaneous, quasi-public-regarding messages in which Defendants, as celebrities, were merely seeking to educate people about cryptocurrency and share their own supposed enthusiasm for Voyager's products. In fact, these promotions were anything but spontaneous or public-minded; they were scripted, calculated, carefully timed, commercially motivated, and contractually required.

121.     Moreover, Defendants' own financial interests depended on getting users to sign up for Voyager—not only because they had been paid for performing that service, but also because they had expectations of being long-term brand ambassadors for Voyager under lucrative sponsorship contracts. And as discussed in more detail below, they were paid in Voyager's own token and therefore stood to benefit from that token's long-term growth and success.

   **1.  Matt Barkley**

        **a.  Matt Barkley Partnered with Voyager to Promote Its Platform**

122.     Defendant Matt Barkley also partnered with Voyager to become and advisory and provide Voyager with spokesperson and marketing services. Those services included posting on social media, engaging with Voyager's social media posts, and appearing in still and video media.

---

*adopted,* 2020 WL 7481304 (S.D. Fla. June 12, 2020) (outlining the requirements to prevail on a claim under Fla. Stat. § 517.07 and not including reliance); *Matter of Bruno,* 2021 WL 1140095, at *6 (N.J. Super. Ct. App. Div. Mar. 25, 2021) (outlining the requirements to prevail on a claim under N.J.S.A. 49:3-60 and not including reliance); *Musolino v. Yeshiva Machzikei Hadas Belz,* 137 F.App'x 321 (11th Cir. 2005) (affirming judgment that the Defendant had violated Fla. Stat. § 517.07, even though the district court did not conclude that reliance is an element of a claim under Fla. Stat. § 517.07).

123.   In exchange for these services, Barkley received a substantial total compensation package.

124.   Barkley did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

### b. Barkley Engaged in a Sustained and Aggressive Promotion and Advertising Campaign

125.   Barkley partnered with Voyager and provided services in accordance with his agreement. For example, he posted on social media and appeared in images used to promote Voyager, including on social media platforms. As shown below, both Barkley and Voyager promoted their partnership on their social media accounts, including Twitter, TikTok, Facebook, Youtube, and Instagram, in an effort to lure consumers to invest with Voyager:[35, 36, 37, 38, 39, 40]

---

[35] https://twitter.com/MattBarkley/status/1532782503085236224

[36] https://www.tiktok.com/@investvoyager/video/7104301998689766698

[37] https://www.instagram.com/p/CcBMN_SJU5c/

[38] https://www.instagram.com/p/CNlrD5RAm5t/

[39] https://twitter.com/MattBarkley/status/1534696948187398144

[40] https://twitter.com/investvoyager/status/1511731219708448768













126.     Barkley did not only promote the Voyager platform, he also publicly promoted Voyager's VGX token and was hailed as a "VGX Hero":[41, 42]



---

[41] https://twitter.com/MattBarkley/status/1423066547703226370

[42] https://twitter.com/MattBarkley/status/1423044997537050624



127.    As part of his promotional efforts, Barkley also engaged in promotions to reward new users.  New Voyager customers who used Barkley's referral code were offered $25 in free Bitcoin if when the they created an account with Voyager and traded $100:[43, 44, 45]

---

[43] https://twitter.com/MattBarkley/status/1453882809236566020

[44] https://twitter.com/MattBarkley/status/1364245020400754689

[45] https://twitter.com/MattBarkley/status/1332417147453235201







128.    Barkley also appeared as a special guest at an EFT Think Tank virtual event in February 2021 to discuss his passion for cryptocurrency.  Voyager used its social media account to publicize the event, and highlight the "growth" that Barkley had "gotten to witness at @investvoyager."[46]

---

[46] https://twitter.com/investvoyager/status/1362129845744975873



129.    Barkley encouraged more than a hundred thousand of his followers on social media to invest with the Voyager platform Barkley also publicly suggested that NFL teams and college endowments should "get . . into crypto" using the Voyager platform.[47]

---

[47] https://twitter.com/investvoyager/status/1128351398767267840



130.     Barkley frequently "reposted" Voyager's social media posts, including Voyager's posts

that promised that investors could "earn up to 9.5% interest APR on 22 top digital assets."[48]

_____

[48] https://twitter.com/investvoyager/status/1326262136486694913



       **c. Barkley Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.**

131.      Barkley had financial incentive to induce Plaintiffs to invest with Voyager in order to continue the ambassador relationship and continue receiving payments.

       **d. The Promotions Were Deceptive and Unlawful.**

132.      Barkley and Voyager's promotional campaigns were designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. Barkley did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

133.    Barkley made deceptive statements on his promotions of Voyager, such as his statement that Voyager had fee-free trading with no subscription.[49]

### e.  Barkley Knew or Should Have Known He Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities.

134.    Given Barkley's extensive investment knowledge, passion for cryptocurrency, along with his substantial social media following, he was surely aware of the potential concerns about companies selling unregistered crypto securities, especially to his thousands of followers.

### f.  The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

135.    Barkley's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

### 2.  Marshall Faulk

### a.  Marshall Faulk Partnered with Voyager to Promote Its Platform.

136.    On or about December 2020, Marshall Faulk partnered with Voyager to become a key advisor and provide it with spokesperson and marketing services to help "educate investors about Voyager's commission-free, state-of-the-art, agency brokerage model offering investors the broadest selection of digital assets to trade and invest in."[50]

137.    In exchange for these services, Faulk received a substantial total compensation package.

138.    Faulk did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

---

[49] https://twitter.com/MattBarkley/status/1457383521689821184

[50] https://www.prnewswire.com/news-releases/nfl-hall-of-fame-legend-marshall-faulk-joins-voyager-digital-as-key-advisor-301192014.html

139.     Starting on or about December 2020, Faulk and Voyager publicly announced their partnership in a press release.[51]

140.     The press release quotes Faulk as follows: "After discovering Voyager's easy-to-use, consumer-friendly platform, with 55 assets to trade and invest in, I wanted to become more involved and be part of this growing company and industry . . . Teaming with Voyager will allow me to spread the word of the crypto revolution, and help my fans discover the wave of the future, digital assets and Bitcoin, the best performing asset of the past decade."[52]  Faulk goes on to state that "Voyager's platform provides consumers with the best execution on a broad selection of crypto assets. Users can download the app from the Google or Apple App Stores, fund accounts, and invest within minutes."[53]

141.     Faulk further stated: "I look forward to the growth of digital assets as they are further embraced throughout the globe, and believe Voyager is well-positioned to lead the charge, with the industry-leading selection of 22 interest-bearing digital assets, including as much as 9.5% APR on the USDC stablecoin. As Voyager brings new products to market, including debit and credit cards, margin, and Voyager's enhanced rewards Token, investors will benefit from being part of the Voyager community."[54]  Voyager posted part of that quote to its own Facebook account:

---

[51] *Id.*
[52]*Id.*
[53] *Id.*
[54] *Id.*



# NFL Hall of Fame Legend Marshall Faulk Joins Voyager Digital as Key Advisor



NEWS PROVIDED BY
**Voyager Digital (Canada) Ltd. →**
14 Dec, 2020, 08:00 ET

SHARE THIS ARTICLE

*- Faulk will help market Voyager's platform and industry-leading selection of 22 interest-bearing digital assets -*

CSE: VYGR
OTCQB: **VYGVF**
Borse Frankfurt: UCD2

NEW YORK, Dec. 14, 2020 /PRNewswire/ - **Voyager Digital  Ltd.** ("Voyager" or the "Company") (CSE: VYGR) (OTCQB: **VYGVF**) (FRA: UCD2), a publicly traded, licensed crypto-asset broker that provides investors with a turnkey solution to trade crypto assets, today announced that NFL Hall of Famer Marshall Faulk will be a joining Voyager as an advisor, helping to educate investors about Voyager's commission-free, state-of-the-art, agency brokerage model offering investors the broadest selection of digital assets to trade and invest in.

142. In the press release, Ehrlich is also quoted as saying: "We're thrilled to have Marshall recognize Voyager's app as his platform of choice to invest in cryptocurrencies . . . Marshall's pursuit of excellence throughout his career translates to his investment practices, and partnering with

Voyager's fully compliant and transparent platform will allow Marshall and his followers to invest intelligently within the digital asset spectrum."[55]

143.     Voyager promoted its partnership with Faulk on social media to lure consumers to invest with Voyager: [56]



### a.  Faulk Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

144.     Faulk had financial incentive to induce Plaintiffs to invest with Voyager in order to continue the ambassador relationship and continue receiving payments.

---

[55] *Id.*
[56] https://twitter.com/investvoyager/status/1338504038200074244

### b. The Promotions Were Deceptive and Unlawful.

145.    Faulk and Voyager's promotional campaign was designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. Faulk did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

146.    Faulk made deceptive statements on his promotions of Voyager, such as his statement that Voyager offered as much as 9.5% APR on the USDC stablecoin and that investors would benefit from being part of the Voyager community.   Faulk also expressly stated that investors would benefit from being part of the Voyager community, in part, due to Voyager's "enhanced rewards Token."[57]

### c. Faulk Knew or Should Have Known He Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities.

147.    Given Faulk's investment knowledge, he was surely aware of the potential concerns about companies selling unregistered crypto securities, especially to his thousands of fans and followers.

### d. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

148.    Faulk's promotion of Voyager was published online, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

---

[57] https://www.prnewswire.com/news-releases/nfl-hall-of-fame-legend-marshall-faulk-joins-voyager-digital-as-key-advisor-301192014.html

### 3. Tracy McGrady

#### a. McGrady Partnered with Voyager to Promote Its Platform.

149.    On or about October 2020, Tracy McGrady partnered with Voyager to become a key advisor and provide it with spokesperson and marketing services. Those services included posting on social media to promote the Voyager platform.

150.    In exchange for these services, McGrady received a substantial total compensation package.

151.    McGrady did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

#### b. McGrady Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

152.    McGrady partnered with Voyager and provided services in accordance with his agreement. He posted on social media, appeared in images used to promote Voyager, and wore Voyager branded merchandise in public, including on social media platforms. Specific examples of his promotions of Voyager follow.

153.    Starting on or about October 2020, McGrady and Voyager publicly announced their partnership in a press release.[58]  Specifically, the press release announced that McGrady had joined Voyager as an advisor to help "educate investors about the interest available on 17 coins, and the ability to invest in the best performing asset of the past ten years, Bitcoin, as well as 50 other cryptocurrencies."[59] The press release also announced that McGrady and his business partner, Grant

---

[58] https://www.prnewswire.com/news-releases/nba-legend-tracy-mcgrady-joins-voyager-digital-as-key-advisor-301154376.html
[59] *Id.*

Haas, would give away $2 million USD ($5 per new account opened under this promotion) to introduce the general public to the Voyager platform.

154.    The press release quotes McGrady:

Following my NBA career, I've been dedicated to educating others on how to better manage their assets and ensure financial security, especially young athletes as they begin lucrative careers . . . When my business partner Grant Haas introduced me to Voyager Digital and the cryptocurrency space, I quickly saw that Voyager is bringing financial services to the masses. The Company's secure platform allows all customers to earn on their money much faster than they would with a traditional bank account, with an impressive 8.5% APR.[60]

155.    The press release also included the following quote from McGrady:

I'm so impressed by this commission-free platform that I want my community to have the opportunity to invest smartly with Voyager, like Grant and I have. Given all of the benefits that Voyager offers to its customers, we've decided to partner with the Company to give away up to USD $2 million to encourage everyone to give cryptocurrency a try using Voyager's easy-to-use and convenient platform.[61]

156.    In the press release, Ehrlich is also quoted as saying:

Tracy joins our team with extensive knowledge of smart investments and a passion for financial literacy. . . Tracy's leadership on the court has transitioned to his financial advisory program with Grant Haas to help young athletes manage their new-found wealth. Having Tracy and Grant on our team as trusted advocates brings even more credibility to our platform. We look forward to working more closely with both Tracy and Grant, and implementing the insights they offer by providing our customers with an unmatched user experience.[62]

---

[60] *Id.*
[61] *Id.*
[62] *Id.*

157.    Further, both McGrady and Voyager promoted their partnership on their social media accounts, including Facebook, Twitter, and Instagram, to lure consumers to invest with Voyager. [63, 64, 65]



[63] https://twitter.com/investvoyager/status/1327055929905467395

[64] https://www.facebook.com/watch/?v=753690045359706

[65] https://www.instagram.com/p/CGh0RgCgDUy/



**I've partnered with @investvoyager to give out $2-Million dollars to my fans! You can now earn 8.5% APR interest on #USDC, which is a gamechanger for your financ...**



158.     As part of his promotional efforts, McGrady engaged in promotions to reward new

users.  New Voyager customers who used the promotion code "TMAC" were offered $5 in free USDC

when they created an account with Voyager, and could sign up to win a jersey signed by McGrady.[66]



159.     Voyager also used its social media account to publicly tout to investors that Tracy

McGrady was "earning interest on $USDC with Voyager":[67]

---

[66] https://twitter.com/investvoyager/status/1323738196954488832

[67] https://twitter.com/investvoyager/status/1325205149283885056



### c. McGrady Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

160.   McGrady had financial incentive to induce Plaintiffs to invest with Voyager to continue the ambassador relationship and continue receiving payments.

### d. The Promotions Were Deceptive and Unlawful

161.   McGrady and Voyager's promotional campaigns were designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. McGrady did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

162.     McGrady made deceptive statements on his promotions of Voyager, such as his statement that Voyager's secure platform allowed customers to earn on their money much faster than they would with a traditional bank account, with an impressive 8.5% APR.[68]

### e.  McGrady Knew or Should Have Known He Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities

163.     Given McGrady's extensive investment knowledge, passion for financial literacy, along with his substantial social media following and knowledge of the NBA's reach, he was surely aware of the potential concerns about companies selling unregistered crypto securities, especially to his hundreds of thousands of followers.

### f.  The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

164.     McGrady's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

### 4.  Scott Melker

### a.  Scott Melker Partnered with Voyager to Promote Its Platform.

165.     Scott Melker also partnered with Voyager to provide it with spokesperson and marketing services. Those services included posting on social media, appearing on a podcast, and posting video media of Voyager's CEO Steve Ehrlich. Specific examples of his promotions of Voyager follow.

166.     In exchange for these services, Melker received a substantial total compensation package.

---

[68] https://www.wfmz.com/news/pr_newswire/pr_newswire_business/nba-legend-tracy-mcgrady-joins-voyager-digital-as-key-advisor/article_44ac77dc-2d2b-57d8-a6fb-00637a023085.html

167.    Melker did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

168.    As shown below, both Melker and Voyager promoted their partnership on their social media accounts, including Facebook, Youtube, and Instagram, to lure consumers to invest with Voyager:[69, 70, 71]



---

[69] https://www.facebook.com/774692806052533/posts/join-the-wolf-of-all-streets-host-scott-melker-for-a-live-ama-with-voyager-ceo-s/1447745022080638/

[70] https://www.youtube.com/watch?v=6APUj-q_ogg

[71] https://www.instagram.com/reel/Cc3zFK_DSKv/





### Live AMA With Voyager CEO Steve Ehrlich

Scott Melker ✔
135K subscribers

126    Share    Save

2,235 views  Streamed live on 9 Nov 2020
Live AMA With Voyager CEO Steve Ehrlich! Submit questions in the comments.

Voyager is my favorite crypto broker and my fiat onramp. Trade crypto fast and commission-free the easy way. Earn up to 9.5% interest on top coins with no lockups and no limits. Download the Voyager app and use code "SCOTT25" to get $25 in free Bitcoin when you create your account.
►►https://go.onelink.me/4gTR/fc3d38ef





169.    As part of his promotional efforts, Melker engaged in promotions to reward new users.

New Voyager customers who used the promotion code "SCOTT25" were offered $25 in free Bitcoin

when they created an account with Voyager.[72]  Melker also encouraged investors to invest in Voyager using his "Rewards Code: WOLF25," claiming that Voyager was a great place "for earning interest on your crypto holdings."[73]

170.     Melker told his hundreds of thousands of followers that "Voyager is my favorite crypto broker and my fiat onramp" and that they could trade crypto "fact and commission-free the easy way" by using the Voyager platform.[74]  Melker also publicly posted that consumers could "[e]arn up to 9.5% interest on top coins with no lockups and no limits."[75]

### b. Melker Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

171.     Melker had financial incentive to induce Plaintiffs to invest with Voyager in order to continue the ambassador relationship and continue receiving payments.

### c. The Promotions Were Deceptive and Unlawful.

172.     Melker and Voyager's promotional campaigns were designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. Melker did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

173.     Melker made deceptive statements on his promotions of Voyager, such as his statement that Voyager's secure platform allowed customers to trade "commission-free" when they used Voyager, and that they could earn up to 9.5% interest on top coins.

---

[72] https://www.youtube.com/watch?v=6APUj-q_ogg
[73] https://twitter.com/GhostofWhitman/status/1722481618722374082/photo/1
[74] *Id.*
[75] *Id.*

**d. Melker Knew or Should Have Known He Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities.**

174.　Given Melker's extensive expertise in cryptocurrency and investment knowledge, he was surely aware of concerns about companies selling unregistered crypto securities, especially to his more than 900,000 social media followers.

**e. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

175.　Melker's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

176.　After Voyager declared bankruptcy, Melker acknowledged the critical role he played in inducing consumers to invest in Voyager, stating: "I understand that people make their own decisions, but they wouldn't have even thought about it if I had not brought [Voyager] to their attention. And, frankly, that's worse than losing my own money."[76]

**5. Stephen Piscotty**

**a. Stephen Piscotty Partnered with Voyager to Promote Its Platform.**

177.　In or about December 2022, Voyager entered into an advisor agreement with Stephen Piscotty.[77]  Pursuant to the agreement, Piscotty agreed to provide social media services to Voyager.

178.　In exchange for these services, Piscotty received a substantial total compensation package, including shares of Voyager and payments for each and every funded account that Piscotty referred.

---

[76] https://cointelegraph.com/news/investors-lament-potentially-lost-millions-on-voyager-bankruptcy

[77] https://webfiles.thecse.com/CSE_Form_7_-_Monthly_Report_-_VYGR_-_Dec2020_01861739x9DEBD.pdf?OTyv1Y1B20mDIIcd2NJ6re4uFDXXKdX6=

179.    Piscotty did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

180.    Piscotty partnered with Voyager and provided services in accordance with his agreement.

181.    On or about April 2021, Voyager issued a press release announcing that it had purchased a full season Oakland A's suite for one Bitcoin, which was the first purchase of a ticket offering priced in cryptocurrency in the MLB.[78] Voyager planned on sharing the suite with its customer community "in the Bay Area and beyond."[79]

182.    In the press release, Voyager's then-CEO commented on the company's "strong relationship with Stephen Piscotty" and intention to grow its relationship "within the A's organization."[80]

183.    The press release quoted Mr. Piscotty as follows: "Just like MLB and the Oakland A's, Voyager has a commitment to excellence.  Voyager makes it easy for anyone to invest in different crypto assets, with zero commissions, and earn interest on Bitcoin, Ethereum, and many more."[81]

184.    Voyager also publicly claimed that Piscotty planned to be part of the "Voyager for Good" program, in which Voyager would donate to charitable foundations when consumers opened a new Voyager account using a special promotional code associated with a Voyager partner.[82]  Piscotty created the ALS Cure Project, a volunteer organization that hosts an annual golf tournament and supports research to help find a cure for ALS.

---

[78] https://www.prnewswire.com/news-releases/voyager-digital-purchases-oakland-as-bitcoin-suite-301260657.html
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] https://www.linkedin.com/pulse/voyager-digital-announces-partnership-two-time-nba-all-star-thomsen/

185.     Piscotty and Voyager promoted their partnership in an effort to lure consumers to invest with Voyager:

### b. Piscotty Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

186.     Piscotty had financial incentive to induce Plaintiffs to invest with Voyager.  Piscotty was paid, in part, in Voyager stock—the value of which depended on the financial success of Voyager.

187.     Further, Piscotty had every incentive to be an effective promoter of Voyager to continue the advisor relationship and continue receiving payments.

### c. The Promotions Were Deceptive and Unlawful.

188.     Piscotty's and Voyager's promotional campaigns were designed to bring cryptocurrency and investing in the deceptive Voyager Platform to the masses. Piscotty did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

### d. Piscotty Knew or Should Have Known He Was Soliciting or Assisting Voyager Solicit Investments in Unregistered Securities.

189.     Given Piscotty's investment knowledge and passion for cryptocurrency, he was surely aware of the potential concerns about companies selling unregistered crypto securities, especially to his hundreds of thousands of followers.

### e. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

190.     Piscotty's promotion of Voyager was published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

## CLASS ACTION ALLEGATIONS

191.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

192.     The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## I.     CLASS DEFINITIONS

193.     Plaintiffs seek to represent the following Nationwide Class, if the Court finds that New Jersey's securities statutes apply to all class members,[83] or in the alternative to represent their respective State Subclasses (collectively, "the Classes") under their respective state laws:

> **(1) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

---

[83] *See, A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782, 788, (3d Cir. 1999) (finding that N.J.S.A. § 49:3–60 governs sales of unregistered securities to people in other states provided the transaction occurred partially in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited, because New Jersey had an interest in maintaining the integrity of legitimate, in-state sellers and brokers by preventing the state "from being used as a base of operations for crooks marauding outside the state.").

Alternative Classes:

**(2) Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

**(3) New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

194.    Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

195.    Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class or State Subclasses, or to include additional classes or Subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all sales of Voyager EPA or VGX Tokens to Plaintiffs and the Class Members (in which Defendants each substantially participated) occurred from Voyager's principal place of business in New Jersey. Although Defendants' promotions, inducements, and solicitations occurred in a variety of states, and were directed at people in Florida and a variety of

states, all of the securities transaction emanated from the State of New Jersey and therefore violated New Jersey law. Plaintiffs seek certification of the State Subclasses in the alternative.72F[84]

## II.     RULE 23 ALLEGATIONS

### A.  Requirements Of Rule 23(A).

#### i.     Numerosity.

196.    The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida and New Jersey to whom Voyager offered and/or sold EPA or VGX Tokens. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Voyager Platform.

#### ii.    Commonality/Predominance.

197.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

---

[84] Plaintiffs' Counsel further represent clients from the states of Arizona, Colorado, Georgia, Illinois, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Puerto Rico, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming, who are all necessarily putative Class Members of the Nationwide Class, and whose claims may be asserted by class representatives from other states. *See In re Zantac (Ranitidine) Prod. Liab. Litigaion*, No. 21-10335, 2022 WL 16729170, at *4 (11th Cir. Nov. 7, 2022) (holding that class representatives have standing to "represent unnamed class members whose claims fall under different states' laws"). Plaintiffs may seek leave of Court to assert claims for these Class Members on behalf of each of these states and territories to the extent necessary to seek certification of Subclasses on their behalf, also in the alternative to the Nationwide Class.

- whether the EPA or VGX Tokens were unregistered securities;

- whether Defendants' participation and/or actions in Voyager's offerings and sales of EPA or VGX Tokens violate the provisions of the Securities Act of Florida and New Jersey;

- the type and measure of damages suffered by Plaintiffs and the Classes;

- whether Defendants' representations are deceptive, unfair, false and misleading;

- whether Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

- whether Defendants' practices violate the UDAP statutes of Florida and New Jersey;

- whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

- whether Plaintiffs and Class members are entitled to injunctive relief;

- whether Plaintiffs and Class members are entitled to declaratory relief; and

- whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

### iii.    Typicality.

198.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPA or VGX Tokens as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform, and Plaintiffs are advancing the same claims and legal theories on behalf of

themselves and all such members. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

### iv.    Adequacy of Representation.

199.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### B.  Requirements of Rule 23(b)(3).

200.    The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPA or VGX Tokens, which are unregistered securities, (2) in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Voyager Platform.

201.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

202.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

203.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

- Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the states;

- Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

- There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

- The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

- Individual suits would not be cost effective or economically maintainable as individual actions; and

- The action is manageable as a class action.

### C.    Requirements of Rule 23(b)(2).

204.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

205.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, aiding and abetting Voyager or conspiring with Voyager to conduct its schemes to defraud investors, and/or in receiving secret

undisclosed compensation for their promotion of the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### D.  Requirements of Rule 23(c)(4).

206.    One of the predominant issues regarding Defendants' liability is whether the EPA or VGX Tokens Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

207.    Another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida and New Jersey in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Voyager Platform. Utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## <u>CHOICE OF LAW</u>

208.    Voyager is a cryptocurrency broker that operated a cryptocurrency investing application for iOS and Android mobile devices which allowed trading across many cryptocurrency exchanges and allowed the holder of the account to earn interest on their crypto.

209.    Voyager promoted and sold EPA or VGX Tokens to vulnerable and unsophisticated consumers throughout the country from its headquarters in Jersey City, New Jersey.

210.    Voyager benefitted from conducting business in New Jersey yet violated relevant New Jersey statutes and regulations to harm consumers both inside and outside state borders. Because the legally pertinent aspects of Voyager's conduct—false promises related to the sale of cryptocurrency and the offer to sell an unregistered security—both occurred within New Jersey, New Jersey has the

right to protect its reputation as a place to conduct lawful and legitimate business through the application of New Jersey state law.

211.    The New Jersey Uniform Securities Act was enacted to "'prevent [New Jersey] from being used as a base of operations for crooks marauding outside the state.'"73F[85] The Third Circuit, relying on long-established precedent, has recognized that "states are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests."74F[86] In *A.S. Goldmen & Co.*, the Third Circuit interpreted N.J.S.A. § 49:3–60 to apply to the sale of unregistered securities to out-of-state consumers, provided that the offer to sell the security occurred in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited.75F[87]

212.    New Jersey has a resounding interest in protecting its reputation as a place to conduct lawful securities transactions and has the most significant relationship to the conduct at issue. All of the pertinent conduct related to the securities transactions emanated from New Jersey. Further, Voyager developed and disseminated its advertising from New Jersey, and reached agreement with each Defendant to provide spokesperson and promotional services from the state of New Jersey. For these reasons, this Court should apply New Jersey law to these claims.

---

[85] *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) quoting *Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931).

[86] *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999).

[87] *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (collecting cases and stating "[c]ourts have always recognized that states have a legitimate interest in regulating securities transactions that occur, in relevant part, within the state."); *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by **exposing** illegitimate resident issuers to liability, *without regard to the markets* of the issuer.") (emphasis added).

213.     In the alternative, this Court should apply the law of the state with the next most significant relationship to the conduct at issue – the state from which each plaintiff purchased the security. Individual classes under Plaintiffs' respective state laws are pled herein, only in the alternative to the nationwide New Jersey Class.

---

### THE NATIONWIDE CLAIMS, OR, IN THE ALTERNATIVE, THE NEW JERSEY CLAIMS

### COUNT ONE
#### Violations of the New -Jersey-Uniform-Securities-Law
#### N.J.S.A. §§ 49:3-60 *et seq.*
#### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)

214.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–213 above, as if fully set forth herein.

215.     The New Jersey Uniform Securities Law ("NJUSL") section 49:3-60, *et seq.*, provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under section 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

216.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 49:3-49(m) of the NJUSL.

217.     The Voyager EPAs and/or VGX Tokens were and are required to be registered with the Bureau pursuant to section 49:3-60.

218.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

219.     Defendants, having partnered with Voyager to broadly solicit potential investors with press conferences, promotional statements, contests, coupon codes, offers of free cryptocurrency,

sign-up incentives, and other strategies to entice people to purchase cryptocurrency on Voyager, and having received millions of dollars in cash and VGX crypto to do so, per N.J.S.A. 49:3-71(d), Defendants materially assisted in and actively participated in Voyager's offer and sale of the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class, and accordingly, violated section 49:3-60.

220.    Additionally, because Defendants knew or should have known about Voyager's sale of unregistered EPAs and/or VGX Tokens, and substantially and materially assisted Voyager in the offer and sale of unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the class, Defendants are secondarily liable as aider-abettors and violated section 49:3-60.

**COUNT TWO**
**Violations of the New Jersey Consumer Fraud Act**
**N.J.S.A §§ 56:8-1** *et seq.*
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed**
**individually and on behalf of the New Jersey Subclass)**

221.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–220 above, as if fully set forth herein.

222.    The New Jersey Consumer Fraud Act ("NJCFA") section 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." § 56:8-2.

223.    Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or sale of merchandise in the State of New Jersey. Cuban's statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

Defendants' omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs and Class members, into investing in the Company's falsely touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

- knowingly and intentionally concealing Defendants' specific roles and interests in Voyager;

- knowingly and intentionally using and/or failing to disclose the use of Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs and/or VGX Tokens;

- Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, or that they should have known were false, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

224.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. § 56:8-19.

225.     Defendants assisted in Voyager's sale and advertisement of merchandise as those terms are defined in section 56:8-1(d) of the NJCFA and generally, as all states use uniform definitions. Voyager EPAs constitute any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale and Defendants advertised such merchandise when it

directly or indirectly publicized, by dissemination, solicitation, or indorsement or circulation to induce directly or indirectly any person to acquire title or interest in said merchandise.

226.    Plaintiffs and Class members are natural persons and/or legal representatives and accordingly, Plaintiffs and Class members are "person(s)" as that term is defined in section 56:8-1(d).

227.    Defendants' unconscionable commercial practices, deceptive acts, and misrepresentations caused damages to Plaintiffs in the amount of their lost investments.

228.    Plaintiffs and Class members have a private right of action against Defendants, and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. § 56:8-19.

229.    Plaintiffs and Class members have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

<strong><u>COUNT THREE</u></strong><br>
<strong>Declaratory Judgment under the New Jersey Declaratory Judgment Act</strong><br>
<strong>N. J. S. A. §§ 2A:16-51 <em>et seq.</em></strong><br>
<strong>(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)</strong>

230.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–229 as if fully set forth herein.

231.    This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

232.    The Declaratory Judgments Act ("NJDJA") section 2A:16-51 *et seq.*, authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

233.     Plaintiffs and Class members have an obvious and significant interest in this lawsuit.

234.     Plaintiffs and members of the Class purchased EPAs and/or VGX Tokens, based in part on justifiable reliance on Defendants' misrepresentations and omissions regarding the Voyager Platform as further described hereinabove.

235.     If the true facts had been known, including but not limited to that the EPAs and/or VGX Tokens are unregistered securities, the Voyager Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and Class members would not have purchased EPAs and/or VGX Tokens in the first place.

236.     Thus, pursuant to NJDJA section 2A:16-51, there is a justiciable controversy over whether the EPAs and/or VGX Tokens were sold illegally, and whether Defendants illegally solicited their purchases from Plaintiffs and Class members. § 2A:16-51.

237.     Plaintiffs and Class members seek an order declaring that the EPAs and/or VGX Tokens were securities required to be registered with the SEC and state regulatory authorities, that the Voyager Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation.

**COUNT FOUR**
**Civil Conspiracy**
**to Violate and Assist in the Violation of the New Jersey Consumer Fraud Act**
**N.J.S.A §§ 56:8-1 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)**

238.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–237 above, as if fully set forth herein.

239.     Voyager directed Defendants to engage in and worked together with Defendants to engage in deceptive conduct, promotions, and marketing tactics designed to target unsophisticated

and innocent consumers in order to get them to download the Voyager Mobile application in violation of NJCFA section 56:8-1.

240.     Voyager represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the deceptive Voyager Platform. Voyager also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the deceptive Voyager Platform were FDIC insured.

241.     Moreover, Defendants engaged in deceptive marketing tactics by failing to disclose that they were being compensated by Voyager for promoting the sale of their securities to consumers in Florida and throughout the United States. These deceptive marketing tactics and misrepresentations include statements about how easy it was to use the Voyager mobile application and how Voyager earnings were more reliable than interest bearing accounts at a bank.

242.     Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

243.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations and omissions of material facts made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform, Voyager's FDIC insured status, and their failure to disclose pertinent information related to their compensation.

244.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such deception and wrongdoing,

because of their experience and extensive relationship with Voyager, as described above and as such, knew that the representations and omissions made to Plaintiffs were deceptive. In the alternative, Plaintiffs argue that Defendants should have known. Plaintiffs plead that Defendants participated in the deceptions and misrepresentations by participating in the creation of Voyager's marketing strategy which contained clear misstatements and omit material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

245.    Defendants' conspiracy with Voyager caused damages to Plaintiffs in the amount of their lost investments.

---

**THE FLORIDA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

### COUNT FIVE
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Gold, Karnas, and Webb individually and on behalf of the Florida Subclass)**

246.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–245 above, as if fully set forth herein.

247.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") section 501.201, *et seq*. The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

248.    Plaintiffs and Class members are consumers —i.e., individuals—as defined by section 501.203. Defendants are engaged in trade or commerce within the meaning of the FDUTPA, and other state statutes, in that they are engaged in advertising, soliciting, providing, offering, or

distributing, whether by sale or otherwise, a good or service, or any property whether tangible or intangible.

249.     FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1).

250.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead and have misled consumers acting reasonably in the circumstances.

251.     Defendants have violated the FDUTPA by engaging in practices that are both deceptive and/or unfair as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

252.     Plaintiffs and Class members have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform after witnessing Defendants' advertisements and downloading the Voyager App in the amount of their lost investments.

253.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

254.     Pursuant to sections 501.211(2) and 501.2105, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

255.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and Class members to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

<u>COUNT SIX</u>
**Violations of the Florida Securities and Investor Protection Act**
**Fla. Stat. §§ 517.07** *et seq.*
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Gold, Karnas, and Webb individually and on behalf of the Florida Subclass)**

256.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–255 above, as if fully set forth herein.

257.     The Florida Securities and Investor Protection Act ("FSIPA"), section 517.07(1) *et seq.*, provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under section 517.051, is sold in a transaction exempt under § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

258.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

259.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 517.021(22)(a), as described more fully herein.

260.     The EPAs and/or VGX Tokens sold and offered for sale to Plaintiffs and Class members were not:

- exempt from registration under § 517.051;

- a federal covered security;

- registered with the Office of Financial Regulations (OFR); or

- sold in a transaction exempt under § 517.061.

261.     Voyager sold and offered to sell the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class.

262.     Defendants are agents of Voyager pursuant to § 517.211, tasked with acting on behalf of Voyager within the state of Florida and beyond to broadly solicit potential investors to purchase cryptocurrency on Voyager. Voyager held out Defendants as possessing sufficient authority to sell securities when, it publicly collaborated or partnered with Cuban, for instance, in a way that sanctioned Cuban to discuss selling Voyager investments and related cryptocurrencies. The average and reasonable person looking at these collaborations and brand partnerships would reasonably believe that Voyager held out Defendants as possessing sufficient authority to sell securities.

263.     More specifically, Voyager acknowledged its agency relationship with Defendants and their roles as agents who would materially participate in the solicitation and sale of cryptocurrency of Voyager within the state of Florida and beyond when Voyager Tweeted that Barkley was a "Voyager Advisor" who had "witness[ed]" Voyager's "growth"; Tweeted that Faulk had "joined Voyager as a key advisor!" and announced in a press release that Faulk had "partner[ed] with" Voyager's platform; announced in a press release that McGrady's leadership in "his financial advisory program" gave him a role as a "trusted advocate[] [that] brings even more credibility to our platform," and Voyager would "implement[] the insights [McGrady] offer[s]"; Tweeted that users should tune in to a Q&A of Ehrlich hosted by Melker to hear Melker "share[] his love of crypto and learning through podcasting"; and touted in a press release that the company had a "strong relationship with Stephen Piscotty."

264.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated FSIPA section 517.07 *et seq.*

**COUNT SEVEN**

**Unjust Enrichment**

**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Gold, Karnas, and Webb individually and on behalf of the Florida Subclass)**

265.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–264 above, as if fully set forth herein.

266.     Defendants have received and retained a benefit from the Plaintiffs in the form of increased payments from their partnership and agent roles with Voyager and increased value of their VGX tokens, and inequity has resulted.

267.     Voyager tracked sign-ups and purchases of their services through the use of promotional codes.  Plaintiffs are informed and believed that Voyager's compensation to Defendants was based in whole or in part on the number or value of sign-ups and purchases Plaintiffs and Class Members made using those promotional codes.  Plaintiffs are informed and believed that Defendants knew about the variability of payment depending on the number or value of sign-ups and purchases Plaintiffs and Class Members made using the promotional codes.  Defendants were thus aware of the benefits conferred on them.

268.     Defendants benefitted through their unjust conduct, which was promoting the sale of unregistered securities (both EPAs and VGX) and promoting use of the deceptive Voyager Platform as detailed in this complaint.

269.     Defendants voluntarily accepted and retained the conferred benefits.

270.     It is inequitable for Defendants to retain these benefits.

271.     This Count is pled in the alternative to the extent Plaintiffs do not have an adequate remedy at law.

272.     As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

      a.      Certifying the Classes as requested herein;

      b.      Awarding actual, direct and compensatory damages;

      c.      Awarding restitution and disgorgement of revenues if warranted;

      d.      Awarding declaratory relief as permitted by law or equity, including declaring Defendants' practices as set forth herein to be unlawful;

      e.      Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing those unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

      f.      Awarding statutory, punitive, and multiple damages, as appropriate;

      g.      Awarding attorneys' fees and costs; and

      h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: February 9, 2024                              Respectfully submitted,


By: */s/ Adam M. Moskowitz*                   By: /s/ Stephen Neal Zack
Adam M. Moskowitz                            Stephen Neal Zack
Florida Bar No. 984280                       Florida Bar No. 145215
adam@moskowitz-law.com                       Tyler Ulrich
Joseph M. Kaye                               Florida Bar No. 94705
Florida Bar No. 117520                       **BOIES SCHILLER FLEXNER LLP**
joseph@moskowitz-law.com                     100 SE 2nd St., Suite 2800
Barbara C. Lewis                             Miami, FL 33131
barbara@moskowitz-law.com                    Office: 305-539-8400
Florida Bar No. 118114                       Fax: 305-539-1307
John E. Rodstrom                             szack@bsfllp.com
john@moskowitz-law.com                       tulrich@bsfllp.com
Florida Bar No. 1003112
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

                                             Reed D. Forbush
*Co-Counsel for Plaintiffs and the Class*    (*pro hac vice* forthcoming)
                                             **BOIES SCHILLER FLEXNER LLP**
                                             44 Montgomery Street
                                             41st Floor
C. Hogan Paschal                             San Francisco, CA 94104
(*pro hac vice* forthcoming)                 Phone (415) 293 6800
**FISHMAN HAYGOOD L.L.P.**                   rforbush@bsfllp.com
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600            *Co-Counsel for Plaintiffs and the Class*
(504) 586-5252; (504) 586-5250 fax
kmiller@fishmanhaygood.com
mwells@fishmanhaygood.com
hpaschal@fishmanhaygood.com                  Jose Ferrer
                                             Florida Bar No. 173746
                                             Desiree Fernandez
*Co-Counsel for Plaintiffs and the Class*    Florida Bar No. 119518
                                             **MARK MIGDAL HAYDEN LLP**
                                             80 SW 8th Street, Suite 1999
                                             Miami, FL 33130
                                             Office: 305-374-0440
                                             jose@markmigdal.com
                                             desiree@markmigdal.com

                                             *Co-Counsel for Plaintiffs and the Class*


88

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on February 9, 2024, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: *<u>/s/  Adam M. Moskowitz</u>*
Adam M. Moskowitz
Florida Bar No. 984280